UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

ERNA CUMMINGS,

        Plaintiff,

    v.

JO ANNE B. BARNHART, Commissioner of
Social Security,

        Defendant.

CASE NO.    C05-5263FDB

REPORT AND
RECOMMENDATION

Noted for February 3, 2006

Plaintiff, Erna Cummings, has brought this matter for judicial review of the denial of her application for supplemental security income ("SSI") benefits. This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following report and recommendation for the Honorable Franklin D. Burgess' review.

FACTUAL AND PROCEDURAL HISTORY

Plaintiff currently is fifty years old.[1] Tr. 40. She has an eleventh grade education, with no past work experience since 1982. Tr. 22, 153, 160.

---

[1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

On February 25, 1999, plaintiff filed an application for SSI benefits, alleging disability as of December 2, 1997, due to thyroid and mental health problems. Tr. 21, 140-42.  Her application was denied initially and upon reconsideration. 38, 40, 58, 64.  She requested a hearing, which was held before an administrative law judge ("ALJ") on March 29, 2001. Tr. 488.  Plaintiff, represented by counsel, appeared and testified at the hearing, as did two medical experts and a vocational expert. Tr. 488-531.

On June 25, 2001, the ALJ issued a decision, finding plaintiff capable of performing a significant number of jobs existing in the national economy, and thus determining her to be not disabled. Tr. 52-53.  On November 20, 2002, plaintiff's request for review was granted by the Appeals Council, which vacated the ALJ's decision and remanded the matter to an ALJ for further administrative proceedings. Tr. 116-17. Specifically, the Appeals Council found additional medical evidence was needed to clarify the nature and severity of plaintiff's mental impairments. Tr. 116.  The Appeals Council directed the ALJ on remand to obtain available updated treatment records, obtain additional orthopedic and mental status evaluations and statements, address all relevant medical opinion evidence and provide supporting rationale for the weight assigned thereto, and if warranted, obtain supplemental vocational expert testimony. Tr. 116-17.

On remand from the Appeals Council, a new hearing was held before the same ALJ on November 13, 2003. Tr. 532.  At that hearing, plaintiff, represented by counsel, appeared and testified, as did a third medical expert and a second vocational expert. Tr. 532-62.  On March 26, 2004, the ALJ issued a decision, again determining plaintiff to be not disabled, finding specifically in relevant part:

    (1)    at step one of the disability evaluation process, plaintiff had not engaged in substantial gainful activity at any time relevant to the decision;

    (2)    at step two, plaintiff had "severe" impairments consisting of depression, a personality disorder and marijuana abuse;

    (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

    (4)    at step four, plaintiff had the residual functional capacity to perform all forms of exertional work activity, with certain non-exertional limitations, but she had no past relevant work; and

    (5)    at step five, plaintiff was capable of performing other jobs existing in significant numbers in the national economy.

Tr. 29-30.  Plaintiff's request for review was denied by the Appeals Council on February 10, 2005, making the ALJ's decision the Commissioner's final decision. Tr. 5C; 20 C.F.R. § 416.1481.

On April 8, 2005, plaintiff filed a complaint in this court seeking review of the ALJ's decision. (Dkt. #1).  Specifically, plaintiff argues that decision should be reversed for an award of benefits for the following reasons:

(a)  the ALJ erred in failing to properly consider the medical source opinions in the record;

(b)  the ALJ erred in not finding plaintiff's physical impairments to be "severe";

(c)  the ALJ erred in not finding any of plaintiff's impairments met or equaled any of those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

(d)  the ALJ erred in assessing plaintiff's credibility;

(d)  the ALJ erred in evaluating the lay witness statements in the record;

(e)  the ALJ erred in assessing plaintiff's residual functional capacity; and

(f)  the vocational expert testimony obtained at the first hearing supports a finding for an outright award of benefits.

The undersigned agrees the ALJ erred in determining plaintiff to be not disabled, but, for the reasons set forth below, recommends that this matter be remanded to the Commissioner for further administrative proceedings.  While plaintiff also has requested oral argument in this matter, the undersigned finds such argument to be unnecessary here.

## DISCUSSION

This court must uphold the Commissioner's determination that plaintiff is not disabled if the Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than one rational interpretation, the court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.    The ALJ Failed to Properly Consider the Medical Source Opinions in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence.  Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998).  Where the medical evidence in the

record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982).  In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Security Administration, 169 F.3d 595, 601 (9th Cir. 1999).  Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725.  The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id.  The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642.  Further, the court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996).  Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31.  However, the ALJ "need not discuss all evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in the original).  The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. Lester, 81 F.3d at 830.  On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Security Administration, 359 F.3d 1190, 1195 (9th Cir.,2004); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001).  An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31.  A nonexamining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-

1    31; Tonapetyan, 242 F.3d at 1149.

2         A.    Dr. Elliot

3         Plaintiff was evaluated by Dr. Andrew Elliott in early June 1999.  He diagnosed her with recurrent

4    major depressive disorder, cannabis dependence, methamphetamine dependence in remission, and a global

5    assessment of functioning ("GAF") of "45-50." Tr. 290.  With respect to plaintiff's functional capabilities,

6    Dr. Elliott opined as follows:

> [She] has chronic maladaptive coping skills . . . She currently would have difficulty
> following work rules, relating to coworkers and dealing with the public secondary to her
> tearfulness and her depressed mood.  She is able to maintain attention and concentration
> and maintain personal appearance and hygiene.  She should be able to understand,
> remember and carry out simple job instructions in a structured, low stress, supervised
> environment.  She has difficulty managing money being unable to manage money from
> month to month.  She certainly could benefit from antidepressant medication and with
> antidepressant medication and psychotherapy she may increase her ability to provide for
> her needs within 30 days.

12   Tr. 290-91.

13        Plaintiff argues the ALJ erred in failing to discuss the GAF score with which Dr. Elliott assessed her.

14   The undersigned agrees.  Indeed, it appears the ALJ did not discuss Dr. Elliott's opinion at all in her 2004

15   decision.  Defendant argues that the ALJ incorporated her analysis of Dr. Elliott's opinion from her 2001

16   decision, and that the Appeals Council did not vacate or overturn that decision.  The ALJ, however, did not

17   state in her 2004 decision that she was incorporating her analysis of the evidence in the record from her

18   2001 decision.  Rather, she merely stated in her 2004 decision that she would "not restate the previous

19   medical evidence reported" in her 2001 decision. Tr. 23.  In addition, although the ALJ did summarize the

20   findings contained in Dr. Elliott's report in her 2001 decision, she failed to provide any specific analysis of

21   those findings in that decision.  See Tr. 46.  As noted above, furthermore, the Appeals Council expressly

22   vacate the ALJ's 2001 decision. Tr. 116.

23        The undersigned does not agree with plaintiff, however, that the GAF score assessed by Dr. Elliott

24   necessarily indicates that she is unable to sustain work, or that the ALJ even was required to accept that

25   score as a valid assessment of her global functioning.  Although a GAF score of 45 to 50 may represent

26   fairly serious symptoms or impairments (see Plaintiff's Opening Brief, Exhibit A), Dr. Elliott also found

27   plaintiff capable of maintaining concentration and attention and understanding, remembering and carrying

28   out simple job instructions, albeit in a structured, low stress and supervised work environment. Tr. 291.  In

REPORT AND RECOMMENDATION
Page - 5

1    addition, Dr. Elliott felt plaintiff might improve her ability to provide for her needs with medication and

2    counseling within thirty days. Id.  As such, it is not clear that a GAF score of 45 to 50 is consistent with the

3    remainder of Dr. Elliott's opinion and clinical findings.

4        B.    Dr. Velmer

5        Plaintiff was evaluated by Dr. Lolita Velmer in early April 2003.  She diagnosed plaintiff as having

6    chronic marijuana abuse, recurrent major depression and a GAF score of 50 to 60. Tr. 358-59.  Dr. Velmer

7    considered plaintiff's depression to be "treatable," though she was not currently on any treatment. Tr. 359.

8    In terms of mental functional capabilities, Dr. Velmer concluded as follows:

9        The claimant might have problems managing her funds as she has difficulty stretching
         her money now and maybe the problem of abusing marijuana has something to do with
10       that.  It could be that she might need an assistant in managing her funds.  She is able to
         perform simple and repetitive tasks and somewhat complex tasks since she is able to do
11       gardening describing being involved in planting flower beds and enjoying that.  She is
         able to accept simple instructions from supervisors.  She was able to follow a three-step
12       command in this interview and interact with coworkers and the public.  She was very
         polite and appropriate regardless of her depressed mood with the interviewer and office
13       staff.

14       I see her able to perform activities on a consistent basis judging by her daily activities at
         home and being able to take full care of herself and her children and interact with some
15       friends at least she has a boyfriend.  She was able to engage in a relationship.  She has
         the capacity to perform work activities on a consistent basis without additional
16       supervision.  She could attend in work circumstances.  She thinks that her depression
         does not interfere with gardening and that definitely is a good treatment for depression if
17       she has the desire and capacity with a plan and enjoy them growing if this could be part
         of her employment as she looks fairly healthy and a strong woman physically.  I do see
18       her capable of performing certain activities even on a regular basis.  Her point was that
         she had children the youngest is 14 years old.  I see her being capable of being involved
19       at least in part-time employment.

20   Id.

21       Plaintiff argues the ALJ erroneously indicated that Dr. Velmer opined that her use of marijuana

22   contributed to her mental limitations.  With respect to that particular issue, the ALJ stated Dr. Velmer noted

23   plaintiff's "continued use of marijuana," and "questioned whether this had an impact" on her financial

24   situation. Tr. 24.  As clearly can be seen above, this is precisely what Dr. Velmer did. Tr. 359.  Thus, the

25   undersigned finds no error here.  Plaintiff also argues the ALJ erred by ignoring or overlooking Dr.

26   Velmer's opinion that she might be capable of performing only part-time work.  Although Dr. Velmer

27   actually opined that plaintiff was capable of performing at least part-time employment, the undersigned does

28   find it unclear as to whether or not Dr. Velmer felt plaintiff could work full-time on a consistent basis.  The

1   ALJ did not address this issue, and to that extent she erred.

2       Defendant argues that "[p]laintiff's suggestion that she could only work part time because she had a

3   fourteen year old daughter is entitled to no weight," because the medical source statement of ability to do

4   mental work-related activities she completed at the same time, "defined the ability to do work on a

5   'sustained basis' as 'eight hours a day for five days a week, or an equivalent work schedule.'" Defendant's

6   Opening Brief, p. 9.  It is not clear, however, that the mere fact this form contains such a definition means

7   that Dr. Velmer actually found plaintiff was able to perform consistent full-time work.  For example, Dr.

8   Velmer found that plaintiff was moderately limited in several mental functional areas, but did not state

9   specifically how that affected her ability to work on a sustained basis.  In addition, Dr. Velmer did not state

10  that plaintiff's ability to work part-time was due to her fourteen year old daughter.  Thus, questions remain

11  regarding her ability to sustain work which the Commissioner must address on remand.

12      With respect to the GAF score assessed by Dr. Velmer, plaintiff again argues that the "lower limit"

13  of that score was consistent with a finding of an inability to hold a job. See Plaintiff's Opening Brief, p. 14

14  and Exhibit A attached thereto.  It is clear, however, that Dr. Velmer, as noted above, felt plaintiff was able

15  to perform at least part-time employment.  Further, Dr. Velmer opined that she was able to do a number of

16  job-related tasks, although it is not entirely certain, considering the reference to part-time work, for exactly

17  how long she felt plaintiff could do them.  Accordingly, this issue also requires further consideration by the

18  Commissioner on remand.

19      C.   Dr. Myers

20      Dana M. Myers, Psy.D., evaluated plaintiff twice in April 2003.  Psychological testing conducted by

21  Dr. Myers placed plaintiff in the "low average" range of intellectual functioning and "low average to

22  average abilities in all areas of memory." Tr. 364.  Plaintiff was diagnosed with a dysthymic disorder, rule

23  out substance induced anxiety disorder, cannabis dependence, a dependent personality disorder,  and a GAF

24  score of 30. Tr. 365.  She endorsed "feeling a low level of depression more often than not," and while she

25  continued "to use cannabis," she felt she did "not have a problem with it." Id.

26      Dr. Myers stated that plaintiff was "not maintaining skill sets which would help her to be prepared

27  for the job market," opining further as follows:

28          Claimant's report of the order of events in her life was unreliable, as it was inconsistent.
           The 'nervous breakdowns' are her stated reason for applying for disability.  She is
           unable to connect these events with specific areas of functioning difficulty.  It appears

REPORT AND RECOMMENDATION
Page - 7

that her levels of ability predate the breakdowns.  Finally, she did not present information indicating that she is unable to manage her funds.

Id.  Dr. Myers recommended that plaintiff be evaluated by the state division of vocational rehabilitation "to determine her ability to work, and what types of jobs would best suit her." Tr. 366.  Dr. Myers felt that "[w]ork in a closely supervised supportive setting would be most suited to her based on [the] current body of information." Id.  In addition, Dr. Myers thought that an assessment of plaintiff's "level of functioning without the cannabis" would be helpful. Id.

At the same time she wrote her evaluation report, Dr. Myers completed a medical source statement of ability to do mental work-related activities.  In that statement, Dr. Myers found plaintiff was markedly limited in her ability to: make judgments on simple work-related decisions; interact appropriately with the public, supervisors and co-workers; and respond appropriately to work pressures in a usual work setting and to changes in a routine work setting. Tr. 367-68.  Dr. Myers also found her moderately limited in her ability to understand, remember and carry out detailed instructions. Tr. 367.  In addition, Dr. Myers stated that while plaintiff's level of functioning had not been demonstrated absent cannabis, she predicted "her abilities would not change significantly due to long term use" and a "lack of insight." Tr. 368.

The ALJ addressed Dr. Myers' opinion as follows:

> I particularly take issue with the assessment offered by Dr. Myers in which the claimant's GAF score was listed as 30.  As mentioned above, this score is questionable given the claimant's fairly active and independent life.  Further, a score of 30 generally represent [sic] someone that is not independent and who has suicidal ideation.  The claimant denied thoughts of suicide at this examination, as well in the prior examination with Dr. Velmer.

Tr. 26.  Plaintiff argues the ALJ erred in evaluating Dr. Meyrs' opinion by failing to provide any reason for not adopting the more specific "marked" limitations she noted in the medical source statement of ability to do mental work-related activities.  The undersigned agrees.  The ALJ did not state whether she rejected those limitations, or whether he even considered them.  Again, to that extent, she erred, and on remand the Commissioner shall re-consider this issue as well.  In is not clear if plaintiff also is challenging the ALJ's rejection of the GAF score assessed by Dr. Myers.  Because the ALJ erred in evaluating the opinion of Dr. Myers for the reason set forth above, however, on remand the Commissioner also shall re-determine if this GAF score is appropriate in light of all of the findings contained in Dr. Myers' opinion and medical source statement, as well as the medical and other evidence in the record as a whole.

D.      Drs. Johnston and Robinson

In mid-July 1999, Dr. Harold B. Johnston and John Robinson, Ph.D., completed a mental residual functional capacity assessment form, in which they found plaintiff to be moderately limited in her ability to: sustain an ordinary work routine; work in coordination with or proximity to others; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. Tr. 292-94.  They further opined in relevant part as follows:

> The claimant can maintain interest and attention for at least two hours at a time and can motivate herself to do what is necessary in a task.  She is able to relate to a limited number of fellow workers.  She prefers a dependent role so needs good supervisors. . . . The depressed mood is treatable in a short time.  She can do work of limited complexity.

Tr. 294.

At the same time, Drs. Johnston and Robinson completed a psychiatric review technique form, in which they found plaintiff had moderate restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, and moderate deficiencies in concentration, persistence or pace. Tr. 303. There was insufficient evidence, however, of episodes of deterioration or decompensation in work or work-like settings. Id.  Dr. Johnston and Dr. Robinson opined that she "would very likely improve rapidly" if she entered treatment for her depression and remained abstinent from her substance abuse. Tr. 305.

Plaintiff argues the ALJ erred by failing to discuss the moderate limitations set forth in the residual functional capacity assessment form completed by Drs. Johnston and Robinson.  The undersigned agrees. The ALJ did not mention in her decision either of the forms completed by Dr. Johnston and Dr. Robinson, let alone provide any analysis of the findings contained therein.  Defendant argues that the ALJ partially accepted the findings contained in the psychiatric review technique form, as evidenced by the ALJ finding that she had mild restrictions in her activities of daily living, moderate difficulties in maintaining social functioning, and moderate deficiencies in concentration, persistence or pace. Tr. 27.  This may have been what the ALJ did here, but without any analysis of the findings of Drs. Johnston and Robinson, it is not possible to tell that this is actually what occurred.  There also is no indication that the ALJ considered the more specific moderate limitations contained in the mental residual functional capacity assessment form

1   completed by Dr. Johnston and Dr. Robinson.  As such, the ALJ erred.

2         E.    Dr. Jackson

3         Melvin Jackson, D.O., performed a physical examination of plaintiff in late November 2000, during

4   which he made the following observations regarding her manual dexterity:

5         The claimant can touch thumb to fingertips, pick up pins and other small objects from a
      firm surface as well as grasp and manipulate objects well.  She could open and close a
6     large safety pin using both hands and remove paper clips and reattach them to a chain of
      paper clips.  She has no difficulty separating coins by feel.  The claimant is somewhat
7     slower than average in performing these manipulations.

8   Tr. 311.  In terms of manipulative limitations, Dr. Jackson opined as follows:

9         The claimant's manual dexterity is good, but somewhat slower than average.  She could
      be expected to perform reaching, handling, feeling, grasping and fingering occasionally.
10    Repetitious use of the hands, fingers and arms should be avoided.

11  Tr. 313.  In a medical source statement of ability to do work-related physical activities completed at the

12  same time, however, Dr. Jackson found that plaintiff had no manipulative limitations. Tr. 317.

13        Plaintiff argues the ALJ erred by not specifically addressing the manipulative limitations contained in

14  Dr. Jackson's evaluation report.  The undersigned agrees.  There is no mention of Dr. Jackson's report, or

15  analysis of the findings contained therein, anywhere in the ALJ's decision.  Defendant argues the ALJ

16  properly incorporated her discussion of Dr. Jackson's opinion in her 2001 opinion into her 2004 opinion,

17  which, defendant asserts, the Appeals Council did not vacate.  Again, however, the Appeals Council did in

18  fact vacate the ALJ's 2001 opinion, and, in any event, while the ALJ summarized Dr. Jackson's opinion in

19  her 2001 decision (Tr. 47), she provided no analysis thereof.

20        While Dr. Arnel M. Brion found that plaintiff had no manipulative limitations, which the ALJ did

21  mention in her decision (Tr. 24),[2] and which is in accordance with the findings contained in the medical

22  source statement completed by Dr. Jackson, the discrepancy with the manipulative limitations set forth in

23  Dr. Jackson's evaluation report still remains.  The undersigned, however, rejects plaintiff's argument that

24  just because Dr. Brion did not have certain MRI evidence of mild to moderate disc bulging in plaintiff's

25  back at the time he examined plaintiff (Tr. 262-63), his opinion regarding her manipulative limitations is

26  entitled to no weight.  There is no indication in the record that the examination of plaintiff conducted by Dr.

27  Brion, who is a licensed physician, was below professional standards.  During that examination, Dr. Brion

28

        [2]The ALJ erroneously refers to Dr. Brion as Dr. "Brown" in her 2004 decision.

found plaintiff to have "good hand and finger dexterity." Tr. 346. Thus, because the issue regarding the severity and nature of plaintiff's manipulative limitations remains unresolved, the Commissioner shall re-consider this issue on remand.

       F.    Dr. Cliggett

       Dr. Donald Cliggett testified at the second hearing that plaintiff had moderate to marked restrictions in her activities of daily living, marked difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and "three or perhaps more" episodes of decompensation of extended duration. Tr. 537-38. With respect to the effect that use of drugs played on plaintiff's mental functioning, Dr. Cliggett testified as follows:

> Well, the depression dates back several years and is recurrent. There is an ebb and flow that seems to be independent, to some extent, of her substance abuse. So I think it's an underlying mental disorder which may fluctuate some with the substance abuse, masking some of the symptoms at times, or at other times accentuating them. But the underlying depression, I believe, is there. And the personality disorder as well is a long-standing condition. . . . I think it would have a moderate effect in accentuating her symptoms, but I don't think it would change some of the other handicapping personality traits. The irritability. The distrust of people. I don't think that's principally a product of substance abuse, but goes along with a personality disorder. And the depressive features as well.

Tr. 539-40.

      The ALJ provided the following assessment of Dr. Cliggett's testimony:

> I do not give controlling weight to the opinion offered by Dr. Cliggett . . . Dr. Cliggett is a psychologist and as such, Dr. Cliggett can speak only to the claimant's mental problems as opposed to Dr. Johnson, a medical physician. Dr. Cliggett opined that the claimant had much greater limitations than reported anywhere in the record. Further, Dr. Cliggett did not consider the claimant's marijuana use to be significant in assessing the claimant's functioning. I do not agree with this opinion and note that this was not the opinion of other examining physicians.

Tr. 27. Plaintiff argues, and the undersigned agrees, these reasons are inadequate to reject Dr. Cliggett's testimony.

      First, as noted by plaintiff, the Social Security Regulations do not distinguish between the weight given to the opinions of psychologists and psychiatrists, at least with respect to opinions regarding mental impairments. See 20 C.F.R. § 416.913(a) (licensed physicians and licensed certified psychologists both deemed to be "acceptable medical sources"); see also 20 C.F.R. § 416.927 (regarding evaluation of opinion evidence). Second, Dr. Cliggett was not the only medical source to find that plaintiff had serious mental functional limitations. For example, as discussed above, Dr. Myers found plaintiff to be markedly limited in

a number of mental functional areas.  In addition, while Dr. Cliggett may have felt that plaintiff's use of

marijuana did not have a significant impact on her mental functioning, his testimony is not necessarily out of

line with other medical evidence in the record.  For example, Dr. Myers and Dr. Johnson both found she

also would continue to have significant issues even absent substance abuse. Tr. 368, 519.  On remand, the

Commissioner thus shall re-consider this evidence as well.

II.    The ALJ Erred in Not Finding Plaintiff's Physical Impairments to Be "Severe" at Step Two of the
        Disability Evaluation Process

To determine whether a claimant is entitled to disability benefits, the ALJ engages in a five-step

sequential evaluation process. 20 C.F.R. § 416.920.  At step two of that process, the ALJ must determine if

an impairment is "severe".  Id.  An impairment is "not severe" if it does not "significantly limit" a claimant's

mental or physical abilities to do basic work activities. 20 C.F.R. § 416.920(a)(4)(iii), ( c); Social Security

Ruling ("SSR") 96-3p, 1996 WL 374181 *1.  Basic work activities are those "abilities and aptitudes

necessary to do most jobs." 20 C.F.R. § 416.921(b); SSR 85- 28, 1985 WL 56856 *3.

An impairment is not severe only if the evidence establishes a slight abnormality that has "no more

than a minimal effect on an individual[']s ability to work."  See SSR 85-28, 1985 WL 56856 *3; Smolen v.

Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); Yuckert v. Bowen, 841 F.2d 303, 306 (9th Cir.1988).  Plaintiff

has the burden of proving that his "impairments or their symptoms affect his ability to perform basic work

activities." Edlund v. Massanari, 253 F.3d 1152, 1159-60 (9th Cir. 2001); Tidwell v. Apfel, 161 F.3d 599,

601 (9th Cir. 1998).  The step two inquiry described above, however, is a *de minimis* screening device used

to dispose of groundless claims.  Smolen, 80 F.3d at 1290.

At step two of the disability evaluation process, the ALJ found as follows:

> In the previous decision, I found a number of physical impairments, as well as her mental
> impairments.  With the updated evidence, the record supports a finding that the claimant
> has depression, personality disorder, and marijuana abuse, impairments which cause
> significant vocationally relevant limitations.
>
> I do not find that the claimant has any impairment that imposes any physical limitations.
> In that regard, I find the claimant's thyroid problem resolved with surgery and treatment.
> The claimant's skin problems do not impose any limitation in her ability to work.  While
> she may be uncomfortable going out in public, her skin disorder does no [sic] prevent
> her from doing so nor does it cause any other functional limitations in her ability to
> work.  The claimant did not testify about any physical problems or limitations at the
> hearing.  Therefore, I find the claimant's degenerative disc disease of the spine and
> knees and her asthma are no longer severe impairments.

Tr. 26.  Plaintiff argues the ALJ cannot utilize her lack of testimony about physical problems at the second

REPORT AND RECOMMENDATION
Page - 12

hearing to find she no longer has severe physical impairments, because the ALJ's comments at that hearing indicated that she was not interested in having her re-testify regarding the physical conditions she testified to at the prior first hearing.  While it is true the ALJ stated at the second hearing, that plaintiff did not need to re-testify regarding the testimony she provided at the first hearing and that she was "more interested" if anything had changed or was different, the ALJ did not appear to actually prevent plaintiff from testifying regarding her current physical limitations. Tr. 552.  Indeed, prior to the ALJ's comment, plaintiff's attorney elicited testimony from plaintiff regarding her skin problems. Tr. 549-52.

Nevertheless, the undersigned finds the ALJ's reliance on the fact that she did not testify as to any other physical problems at the second hearing to be an insufficient reason for finding that she had no severe physical impairment at step two.  First, the undersigned did not specifically ask about the nature and extent of her physical impairments at the second hearing. See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (ALJ has duty to fully and fairly develop record and to assure claimant's interests are considered). Second, while the lack of testimony regarding plaintiff's physical impairments at the second hearing may be indicative that plaintiff herself is not fully credible, it does not necessarily mean that there is no medical evidence in the record that she has severe physical impairments.

Indeed, as discussed above, the medical evidence in the record remains unclear as to the extent of plaintiff's manipulative limitations.  Further, although the ALJ made findings regarding plaintiff's physical limitations as noted above, she did not state what medical evidence in the record, if any, supported those findings.  Accordingly, the undersigned finds the reasons the ALJ provided for finding no severe physical impairments to be insufficient.  On remand, therefore, the Commissioner, in addition to re-evaluating the medical evidence in the record in accordance with the findings set forth above, also shall re-determine if plaintiff has any severe physical limitations at step two of the disability evaluation process.

III.   Plaintiff's Step Three Claim

At step three of the evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or equal any of the impairments listed in 20 C.F. R. Part 404, Subpart P, Appendix 1 (the "Listings"). 20 C.F.R § 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  If any of the claimant's impairments meet or equal a listed impairment, he or she is deemed disabled. Id.  The burden of proof is on the claimant to establish he or she meets or equals any of the impairments in the Listings.

REPORT AND RECOMMENDATION
Page - 13

1  Tacket, 180 F.3d at 1098.

2         A mental or physical impairment "must result from anatomical, physiological, or psychological

3  abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20

4  C.F.R. § 416.908.  It must be established by medical evidence "consisting of signs, symptoms, and

5  laboratory findings." Id.  An impairment meets a listed impairment "only when it manifests the specific

6  findings described in the set of medical criteria for that listed impairment." SSR 83-19, 1983 WL 31248 *2.

7  An impairment equals a listed impairment "only if the medical findings (defined as a set of symptoms, signs,

8  and laboratory findings) are at least equivalent in severity to the set of medical findings for the listed

9  impairment." Id. at *2.  However, "symptoms alone" will not justify a finding of equivalence. Id.

10        Plaintiff argues in her reply brief that the ALJ erred at step three of the disability evaluation process

11 in not finding any of her mental impairments met Listing 12.04 based on Dr. Cliggett's testimony.  While it

12 may be that Dr. Cliggett's testimony indicated he believed that plaintiff met the criteria for Listing 12.04, as

13 discussed above, although the ALJ erred in rejecting that testimony, it is not at all clear, considering the

14 medical evidence in the record as a whole, that the ALJ was required to accept it.  In addition, it should be

15 noted that plaintiff waited until she filed her reply brief to challenge the ALJ's step three analysis.  On that

16 basis alone, the undersigned finds it appropriate to decline to address that issue here.  Nevertheless, if on

17 remand, a determination is made to adopt Dr. Cliggett's testimony, the Commissioner also shall decide

18 whether or not such testimony supports a finding of disability at step three.

19 IV.    The ALJ Did Not Err in Assessing Plaintiff's Credibility

20        Questions of credibility are solely within the control of the ALJ.  Sample v. Schweiker, 694 F.2d

21 639, 642 (9th Cir. 1982).  The court should not "second-guess" this credibility determination.  Allen, 749

22 F.2d at 580.  In addition, the court may not reverse a credibility determination where that determination is

23 based on contradictory or ambiguous evidence.  Id. at 579.  That some of the reasons for discrediting a

24 claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long

25 as that determination is supported by substantial evidence.  Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th

26 Cir. 2001).

27        To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the

28 disbelief."  Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1996) (citation omitted).  The ALJ "must identify

what testimony is not credible and what evidence undermines the claimant's complaints." Id.; Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. Id.

The ALJ provided the following reasons for discounting plaintiff's credibility:

> I do not find the claimant credible for the same reasons expressed in the first decision, specifically, her activities of daily living, her continued marijuana use, and past history of substance abuse, her legal problems, the cost associated with continuing marijuana use despite her complaints of ongoing money problems, her failure to follow through with prescribed treatment and her lack of compliance with treatment.

Tr. 28. In her 2001 decision, the ALJ set forth those reasons as follows:

> The claimant's statements concerning her impairments and their impact on her ability to work are not entirely credible for a variety of reasons. Most significantly, I find inconsistencies in the claimant's testimony when compared to the record. Specifically, she stated she had successfully completed her drug treatment program even though she admitted she had a positive urinalysis for marijuana. The treatment records specifically state that she was discharged at Phase III of the program because she tested positive for amphetamine/methamphetamine, proposophene and THC (Exhibit 2F, p. 2).
>
> Further, the claimant down played her use of drugs. The treatment program was required due to a drug possession charge. The claimant testified this was due to marijuana, however, the record includes possession of methamphetamine as well. In a questionnaire assessment at the time of onset of treatment, the claimant reported a habit of several hundred dollars a month for marijuana ($160) and methamphetamine ($400) (Exhibit 2F, p. 43). At the hearing the claimant denied that she used these amounts of drugs. I find it highly unlikely that these figures would have arbitrarily been added to the report without the claimant's knowledge or that they were not based on her assertion at the time. Further, the claimant was unable to clarify to me at the hearing her source of income for acquiring drugs, even at a lesser level than reported in this report.
>
> Additionally, the record is replete with evidence that the claimant did not follow through with medical advice and treatment. I specifically note the reports that she discontinued thyroid medication (Exhibit 3F). These notes indicate she stopped the medication because she had begun to feel better. Nowhere do the records reflect discontinuation because of side effects as she asserted at the hearing.
>
> Her lack of compliance with medical treatment is not restricted to medication. Dr.

1     [Robert S.] Rubenstein noted the claimant had stopped performing cervical range of
2     motion exercises that he recommended, as well as stopped using the medication he
    prescribed (Exhibit 4F).

3     For the above reasons, as well as the claimant's ability to perform a wide range of
    activities throughout the day as discussed earlier, I do not find the claimant credible
4     regarding her testimony that she is totally disabled.

5 Tr. 50-51.

6       Plaintiff first takes issue with the ALJ's finding regarding her activities of daily living, arguing that

7 those activities were quite limited and inconsistent with an ability to engage in substantial gainful activity.

8 To determine whether a claimant's symptom testimony is credible, the ALJ may consider his or her daily

9 activities. Smolen, 80 F.3d at 1284. Such testimony may be rejected if the claimant "is able to spend a

10 substantial part of his or her day performing household chores or other activities that are transferable to a

11 work setting." Id. at 1284 n.7. The claimant need not be "utterly incapacitated" to be eligible for disability

12 benefits, and "many home activities may not be easily transferable to a work environment." Id.

13       The undersigned finds the ALJ did not err in discounting plaintiff's credibility in part based on her

14 activities of daily living. In early June 1999, plaintiff reported that she did the laundry, that she cleaned and

15 shopped "throughout the day," and that she "usually" gardened "in the afternoons." Tr. 289. In late

16 November 2000, she reported spending an average day "doing light housework," albeit with "frequent rest

17 breaks," and being "able to cook, sweep, mop and use the vacuum," though again not "for too long at a

18 time." Tr. 307. In early April 2003, plaintiff told Dr. Velmer she fixed dinner, bathed herself, kept her

19 clothes clean, cleaned her house, went grocery shopping as needed, kept her doctors appointments, and

20 picked her daughter up after school activities. Tr. 357. Dr. Velmer saw plaintiff being "able to perform

21 activities on a consistent basis judging by her daily activities at home and being able to take full care of

22 herself and her children." Tr. 359. Also in early April 2003, plaintiff reported being able to "walk 5 city

23 blocks" and to "climb 3 flights of stairs." Tr. 346. Her reported ability to do the majority of these activities

24 for a substantial part of the day is not consistent with an allegation of total disability.

25       The ALJ's findings concerning plaintiff's inconsistent statements regarding her past substance abuse

26 also constitute clear and convincing reasons for discounting her credibility. See Smolen, 80 F.3d at 1273

27 (ALJ may consider prior inconsistent statements concerning symptoms and other testimony appearing less

28 than candid). Plaintiff argues the ALJ did not make clear how her prior legal problems detracted from her

credibility.  However, the ALJ referred to plaintiff's drug possession charge, and subsequent placement in treatment for substance abuse, to show her inconsistent statements regarding and thus lack of credibility concerning her past drug use.  In addition, although the record may not clearly show how plaintiff obtained her marijuana, given that she reported a habit of using drugs worth upwards of $560 a month and than later denied in the context of a disability hearing ever using those amounts, it was not improper for the ALJ to question her credibility on this issue.  See also Allen, 749 F.2d at 579 (ALJ's credibility determination may not be reversed where it is based on contradictory or ambiguous evidence).

Failure to assert a good reason for not seeking, or following a prescribed course of, treatment, or a finding that a proffered reason is not believable, also "can cast doubt on the sincerity of the claimant's pain testimony." Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989).  As noted above, the ALJ found the record showed that plaintiff stopped taking her thyroid medication and discontinued her range of motion exercises even though none of her physicians had recommended that she do so. See Tr. 260, 266, 268, 272.  This too, then, was also a proper reason for discounting plaintiff's credibility.  The undersigned, therefore, finds the ALJ's credibility determination overall to have been proper.

V.     The ALJ Properly Assessed the Lay Witness Statements in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d, 503, 511 (9th Cir. 2001).  An ALJ may discount lay testimony if it conflicts with the medical evidence. Id.; Vincent v. Heckler, 739 F.2d 1393, 1395 (9th Cir. 1984) (proper for ALJ to discount lay testimony that conflicts with available medical evidence).  In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Lewis, 236 F.3d at 512.  The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

The record contains lay witness statements from two of plaintiff's friends and neighbors. Tr. 185-96. With respect to those statements, the ALJ found as follows:

> I have considered the lay witness reports at Exhibits 11E-12E.  The witnesses report observations of both mental and physical problems and opined that the claimant is significantly limited.  These accounts do not agree with the claimant's fairly active life involving chores, taking care of her daughter, engaging in a relationship with a

boyfriend, driving her car and attending to her own medical needs.  For these reasons, I
do not consider the lay witness accounts particularly credible.

Tr. 28.  Plaintiff argues the above reasons are insufficient, because the ALJ ignored plaintiff's testimony and

prior reports that she is much more limited in her ability to do housework and engage in other activities of

daily living.  While plaintiff may have so reported and testified at the hearings, as discussed above, she

reported a fairly good ability to participate in these activities for a substantial part of the day on a number of

separate occasions, and the ALJ did not err in discounting her credibility because of this.  As such, the ALJ

did not err in discounting the credibility of the two lay witnesses for that reason as well.

VI.    The ALJ Erred in Assessing Plaintiff's Residual Functional Capacity

      If a disability determination "cannot be made on the basis of medical factors alone at step three of

the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and

assess his or her "remaining capacities for work-related activities." SSR 96-8p, 1996 WL 374184 *2.  A

claimant's residual functional capacity assessment is used at step four to determine whether he or she can do

his or her past relevant work, and at step five to determine whether he or she can do other work. Id.

Residual functional capacity thus is what the claimant "can still do despite his or her limitations." Id.

      A claimant's residual functional capacity is the maximum amount of work the claimant is able to

perform based on all of the relevant evidence in the record. Id.  However, a claimant's inability to work

must result from his or her "physical or mental impairment(s)." Id.  Thus, the ALJ must consider only those

limitations and restrictions "attributable to medically determinable impairments." Id.  In assessing a

claimant's residual functional capacity, the ALJ also is required to discuss why the claimant's "symptom-

related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the

medical or other evidence." Id. at *7.

      Here, the ALJ assessed plaintiff with the following residual functional capacity:

> [T]he claimant retains the residual functional capacity to perform the demands of all
> levels of work activity.  The claimant's capacity for work is diminished by significant
> non-exertional limitations.  In that regard, I find the claimant limited to simple and
> routine tasks.  She is able to engage in minimal interaction with coworkers but is not
> able to work with the general public.

Tr. 28.  Plaintiff argues the above residual functional capacity assessment is erroneous, because the ALJ

erred in evaluating the medical evidence and lay witness statements in the record.  While, as just discussed,

the ALJ did not err in rejecting those lay witness statements, also as discussed above, the ALJ did err in

REPORT AND RECOMMENDATION
Page - 18

1  evaluating the medical evidence in the record regarding both plaintiff's physical and mental impairments.

2  Thus, it is not clear the ALJ's assessment of plaintiff's residual functional capacity accurately describes her

3  actual work-related limitations.  Accordingly, on remand, in addition to re-evaluating the medical evidence

4  in the record, the Commissioner also shall re-determine plaintiff's residual functional capacity.

5  VII.    The Record in This Case Does Not Warrant Remand for an Award of Benefits

6          At step five of the disability evaluation process, the ALJ found that plaintiff could perform other

7  jobs existing in significant numbers based on the vocational expert testimony obtained in the first hearing.

8  Tr. 28.  An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical

9  posed by the ALJ. Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d

10  1450, 1456 (9th Cir. 1984).  The vocational expert's testimony therefore must be reliable in light of the

11  medical evidence to qualify as substantial evidence. Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988).

12  Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by

13  the medical record." Embrey, 849 F.2d at 422 (citations omitted).  The ALJ, however, may omit from that

14  description those limitations he finds do not exist. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

15  Because, as discussed above, the ALJ erred in evaluating the medical source evidence in the record and in

16  assessing plaintiff's residual functional capacity, it is not clear that the hypothetical question in the first

17  hearing upon which the vocational expert based her testimony was accurate.  As such, the vocational

18  expert's testimony upon which the ALJ based her findings is not reliable.

19          The court may remand this case "either for additional evidence and findings or to award benefits."

20  Smolen, 80 F.3d at 1292.  Generally, when the court reverses an ALJ's decision, "the proper course, except

21  in rare circumstances, is to remand to the agency for additional investigation or explanation." Benecke v.

22  Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).  Thus, it is "the unusual case in which it is

23  clear from the record that the claimant is unable to perform gainful employment in the national economy,"

24  that "remand for an immediate award of benefits is appropriate." Id.

25          Benefits may be awarded where "the record has been fully developed" and "further administrative

26  proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

27  1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

28              (1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's]
                evidence, (2) there are no outstanding issues that must be resolved before a

REPORT AND RECOMMENDATION
Page - 19

determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Because, as discussed above, issues still remain regarding plaintiff's physical and mental limitations and their effect on her residual functional capacity, this matter should be remanded to the Commissioner to conduct further administrative proceedings in accordance with the findings contained herein.

Plaintiff argues that because the ALJ gave more weight to the testimony of Dr. Johnson than to that of Dr. Cliggett, and because Dr. Johnson endorsed the moderate mental functional limitations found by Dr. Johnston and Dr. Robinson, the ALJ implicitly endorsed those limitations as well.  Plaintiff further argues that this was not harmless error, because the testimony of the vocational expert at the first administrative hearing, shows that she would be precluded from performing any work.  The undersigned disagrees. First, as discussed above, while the ALJ appeared to adopt for the most part the moderate functional limitations contained in the psychiatric review technique form completed by Drs. Johnston and Robinson, it is not at all clear that he considered the more specific moderate limitations set forth in the medical source statement they completed, and that plaintiff refers to here.

In addition, the testimony of the vocational expert in the first hearing depended on how the term "moderate" was defined, a determination that the vocational expert specifically left to the ALJ and/or the parties to make. Tr. 528-30.  Thus, while the vocational expert did testify as to how she had used that term in the past, and that if that use was employed an individual with the specific moderate limitations outlined by Dr. Johnston and Dr. Robinson in their medical source statement would push that individual "over the edge" (Tr. 529), no determination by the ALJ nor any agreement by the parties as to whether such use is appropriate or applicable in this case appears to have been made here.  Accordingly, the undersigned does not find that the record at this point clearly establishes that plaintiff is disabled.

<u>CONCLUSION</u>

Based on the foregoing discussion, the court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written

REPORT AND RECOMMENDATION
Page - 20

objections thereto. <u>See also</u> Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **February 3, 2006**, as noted in the caption.

DATED this 5th day of January, 2006.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 21